# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                           Criminal Action No. 2:07cr23
                                                              (Maxwell)

**MICHAEL GENE SHORT,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

Came the Defendant, Michael Gene Short, by and through counsel, Timothy M. Sirk, and came the Government, by and through Assistant United States Attorney Stephen D. Warner, on the 29th day of November, 2007, for an evidentiary hearing upon Defendant's Motion to Suppress Illegally Seized Evidence, filed on November 8, 2007, and Defendant's Motion to Suppress Statement, filed on November 19, 2007. After hearing the evidence and argument presented by each party, the Court took Defendant's pending Motions to Suppress under advisement. After careful consideration of the entire record before the Court, the Court finds that each of Defendant's pending Motions to Suppress, for the reasons herein stated, should be denied.

### Findings of Fact

By a preponderance of all the evidence presented, including testimony, exhibits, and the video interview (Government Exhibit 6), which the Court previously received on compact disc and viewed, the Court makes the following findings of fact:

In order to investigate possible methamphetamine manufacturing in Braxton County, Sergeant John Bonazzo, West Virginia State Police, started checking pseudoephedrine sales logs in the area to see who had been buying pseudoephedrine. He also checked the local farm supply stores for iodine sells, which is also used in the production of methamphetamine. He found that Misty Westfall was purchasing both pseudoephedrine and iodine in Braxton, Nicholas, and other nearby counties. Further investigation by Sergeant Bonazzo revealed that Misty Westfall lived with Michael Short, and Sergeant Bonazzo began investigating Defendant Short as well. Sergeant Bonazzo found that Defendant Short's name often appeared on the pseudoephedrine logs right before or after Misty Westfall's.

On April 4, 2006, Sergeant Bonazzo interviewed Misty Westfall, and she agreed to cooperate. She agreed to call if Defendant planned on cooking methamphetamine again, and signed a consent to search the house in the event Defendant Short was cooking methamphetamine, which consent was dated April 4, 2006. (Government Exhibit 2). Sergeant Bonazzo understood from Misty that she had lived with Defendant for several months, that the telephone was in her name, and that she paid some of the other bills. After some time, Sergeant Bonazzo realized that Misty was not going to call, and he obtained Braxton County arrest warrants for Misty Westfall and Michael Short. (Government Exhibit 4). A prior arrest warrant had been issued in Nicholas County for Misty Westfall for purchasing more than the legal limit of pseudoephedrine. (Government Exhibit 5).

On April 15, 2006, Sergeant Bonazzo, along with members of his detachment, followed the Clay County Sheriff, Sheriff Holcomb, and a deputy to Defendant's

residence in order to execute the arrest warrants.  When they arrived, Sergeant Bonazzo ran to the back of the house to secure the premises.  He then heard yelling from the front of the house, and ran back to the front, where he observed that Sheriff Holcomb had Defendant Short on the ground, handcuffed, and was in the process of searching his pockets.  Sergeant Bonazzo testified that it would only have taken 20 to 30 seconds for him to return to the front of the house, and that he did not observe any hands on the Defendant at that time, other than just the emptying of his pockets.  Pleadings and testimony, which have not been specifically disputed by Defendant, suggest that the Defendant had put his hands in his pockets after leaving his residence, that Sheriff Holcomb had told him to remove his hands from his pockets, and that Defendant Short refused to comply.  Sheriff Holcomb apparently threatened Defendant, in some manner, by either stating that he would shoot him or that he would kill him if he did not remove his hands from his pockets.  That is when Sheriff Holcomb apparently took the Defendant to the ground and placed him in custody.  Upon returning to the front of the house, Sergeant Bonazzo did not observe any cuts, bruises or visible injuries to the Defendant.  Sergeant Bonazzo then entered the house to ensure there were no other imminent threats, and encountered Misty Westfall, who he took back out front and placed in custody.

Sergeant Bonazzo inquired of Misty whether the consent to search, which she had previously signed on April 4, 2006, was still valid, and she said that it was.  Misty then re-signed the consent to search, dated April 15, 2006.  (Government Exhibit 2).  Sergeant Bonazzo approached Michael Short and asked if he consented to the search of the home.  He responded that he didn't know.  Sergeant Bonazzo informed

Defendant Short that he needed a yes or no answer, but the Defendant continued to respond that he just didn't know what to do. At some point during this exchange, Defendant Short said that he didn't know if he should call a lawyer, and Sergeant Bonazzo responded that that was his right. Finally, after failing to get a yes or no response from Defendant Short, Sergeant Bonazzo informed the Defendant that Misty had given consent to search the residence, and that they were going to search it. Defendant Short did not respond, and the residence was searched.

After searching the house and seizing several items of evidence, Misty Westfall and Michael Short were transported by the Braxton County West Virginia State Police back to the Sutton detachment, which is located next to the jail, 25 to 30 minutes away, to complete the paperwork. The Clay County Sheriff's Department did not participate in the transport. A magistrate was not available at that time. While there, interviews were conducted. Sergeant Bonazzo filled out a Miranda Form and read Defendant his Miranda rights. Defendant signed a waiver of his rights. (Government Exhibit 3). Sergeant Bonazzo proceeded to interview the Defendant regarding his and Misty Westfall's methamphetamine manufacturing activity.

Before and during the interview, Sergeant Bonazzo, on more than one occasion, informed the Defendant that he did not have to talk, that he could quit at any time, and that what he said could be used against him in Court. During the interview, Defendant never stated that he didn't wish to talk or make further statements. While Sergeant Bonazzo was going over the wavier of rights form with Defendant, the Defendant stated that, "they threatened to kill me." Sergeant Bonazzo replied, "well, nobody's threatened to kill you to talk to me, right," and the Defendant responded "no." Sergeant Bonazzo

4

then clearly informed the Defendant that he could agree or not agree to talk to him. There was no apparent presence of pressure or intimidation to induce the Defendant to sign the wavier of rights form and agree to the interview. Sergeant Bonazzo, after going over each item on the wavier of rights form with Defendant, said, "if you agree to talk to me, sign right there," and the Defendant proceeded to sign the wavier of rights form. Testimony would suggest that Defendant Short's reference to a threat was referring to the threat from Sheriff Holcomb to shoot the Defendant if he didn't remove his hands from his pockets, and there is no other evidence before the Court of any other threats made to the Defendant.

Early into the interview, Sergeant Bonazzo removed the Defendant's handcuffs, which remained off through the duration of the interview. At one point, Sergeant Bonazzo left the interview room and returned with a glass of water for the Defendant. The Defendant expressed concern during the interview for his dogs, which remained at his residence. Sergeant Bonazzo made it clear that he was going to jail, and that if he could not find someone to care for the animals, they would call the Humane Society or someone to care for them. Sergeant Bonazzo permitted Defendant to use the telephone to arrange for someone to care for the animals. In reviewing the video-tapped interview, the Court finds no appearance of undue intimidation, duress or coercion toward the Defendant during the interview.

## Issues Presented

1. Did Misty Westfall have authority, or the appearance of authority, to give consent to conduct a warrantless search of the residence?

2. Was the search of the residence reasonable under the legal precedent provided by Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515 (2006), when Defendant Michael Short failed to provide a yes or no answer to the request to search his home?

3. Was Defendant Michael Short's statement after his arrest voluntary?

**Discussion**

**I.**

The Government bears the burden of proof by a preponderance of the evidence on the issue of whether Misty Westfall had authority to consent to the search of the residence where she and Defendant Michael Short resided. United States v. Block, 590 F.2d 535, 539 (4th Cir. 1978) *citing* Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788 (1968). The Fourth Amendment protects against government infringement of a reasonable expectation of privacy. U.S. v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652(1984). The two requirements for a privacy interest protected by the Fourth Amendment to exist are, "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507 (1967).

Even where a privacy interest exists, an individual is only protected against searches deemed to be "unreasonable." Illinois v. Rodriguez, 497 U.S. 177, 119 S.Ct. 2793 (1990). The law is well settled that when a search has been consented to, it is not unreasonable pursuant to the Fourth Amendment. Schneckloth v. Bustamonte, 412

U.S. 218, 93 S.Ct. 2041 (1973). Authority to consent lies not only with the Defendant, but also with any third party that possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993 (1974). "The authority which justifies the third-party consent does not rest upon the law of property... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 172, 94 S.Ct. 993. In determining authority to consent to a search, the Court must view the facts from the viewpoint of what a reasonable police officer would have believed. See, United States v. Peterson, 524 F.2d 167 (4th Cir. 1975), *and* United States v. Sells, 496 F.2d 912 (7th Cir. 1974). Consent to search and the appearance of authority to give it is a factual question. Id.

In the case at bar, Sergeant Bonazzo had information that Misty Westfall had been living at Defendant Michael Short's residence for several months, that the residence's telephone was in her name, and that she paid some of the other bills. He also encountered Misty in the residence during his protective sweep, and observed what appeared to be her personal effects around the house. The Court finds, by a preponderance of the evidence, that a reasonable police officer would have concluded that Misty Westfall lived at the residence, which Defendant has not denied, that she had mutual use of the property, and that she had joint access and control. Accordingly, the Court finds that a reasonable police officer would have concluded that Misty Westfall had authority to consent to the search of the residence.

**II.**

Next, the Court will turn to whether the search of the residence was reasonable under the legal precedent provided by Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515 (2006).  In Georgia v. Randolph, Defendant's estranged wife consented to the search of the marital residence.  Defendant, who was present, expressly and unequivocally refused to give consent to search the residence.  The Court, referencing the Matlock Court, noted that authority to consent is recognized by customary social usage, that is, "the question [is] whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection." Id. at 121, 126 S.Ct. 1527.  Ultimately, the Georgia v. Randolph Court held that, "a warrantless search of a shared dwelling for evidence over the *express refusal* of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Id. at 120, 126 S.Ct. 1526 (emphasis added).

The case at bar is distinguishable from Georgia v. Randolph in that the Defendant here did not expressly object to the search of his residence.  After verifying consent to search from Misty Westfall, Sergeant Bonazzo asked Defendant Short whether he consented to the search.  Defendant Short would not give a yes or no answer, but just repeatedly said he did not know what to do. Following the legal precedent, the Court examines this factual situation form the viewpoint of customary social understanding.  If an occupant, having invited a guest into the residence, seeks approval from a co-tenant, the co-tenant's inability to make a decision would not likely be sufficient to overcome the consenting occupant's invitation, and it would be

8

reasonable to expect the guest to enter. It is clear, under the precedent of <u>Georgia v. Randolph</u>, that if Defendant Short had answered "no" when asked if he consented to the search, then the search would have been unreasonable. However, Defendant Short did not expressly refuse consent to search the house. He just said that he did not know what to do and would not make an affirmative decision. Accordingly, because there was no express refusal to consent to the search in the case at bar, the Court finds that the search was reasonable under legal precedent.

### III.

Finally, the Court will examine whether Defendant Short's statement after his arrest was voluntary. In his Memorandum in Support of Defendant's Motion to Suppress Statement, Defendant Short has alleged that he continuously and repeatedly indicated that he did not wish to make a statement without first consulting legal counsel, and that he was severely beaten and kicked by the Clay County Sheriff such that his will was overcome by the conduct of the officers rendering his statement inadmissible.

The Fourth Circuit has found that, "a confession is involuntary and subject to suppression when induced by such duress or coercion, express or implied, that the accused's 'will has been overborne and his capacity for self-determination critically impaired.'" <u>United States v. Wertz</u>, 625 F.2d 1128, 1133 (1980), *citing* <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047 (1973). The <u>Wertz</u> Court goes on to list some circumstances to be considered in determining the voluntariness of a statement, including "the setting in which the confession was obtained, the details of the interrogation itself inducing the confession, and... 'the characteristics of the accused' such as his youth, experience, education maturity, or intelligence." <u>Id</u>. at 1134. The

First Circuit has held, as highlighted by the Wertz Court, that "the voluntariness of a confession cannot be equated to the absolute absence of intimidation." Johnson v. Hall, 605 F.2d 577, 582 (1979).

In the instant matter, the Court has reviewed the video-tapped statement at issue, and carefully considered the testimony presented at the evidentiary hearing on this matter. At no point during the video-tapped interview did the Defendant indicate that he did not wish to continue talking without the advice of legal counsel, despite being advised that he had the right to do so. Testimony during the evidentiary hearing revealed that the Defendant did state, prior to the search of his residence, that he didn't know if he should call a lawyer, and Sergeant Bonazzo advised him that that was his right. No further evidence of Defendant's bare assertion that he repeatedly requested an attorney has been presented, and a review of the video-tapped interview does not support this bare assertion.

A review of the record before the Court also does not support the Defendant's bare assertion that his free will was overcome by the conduct of the officers so as to render his statement inadmissible. The Court has found, by a preponderance of the evidence, that the Defendant was taken to the ground by the Clay County Sheriff outside his home after refusing to remove his hands from his pocket; however, there is no evidence of a severe beating, as alleged by Defendant. During the Court's review of the video-tapped interview, conducted within a few hours of the altercation with the Clay County Sheriff, the Court does not see any visible evidence of injuries to the Defendant. Further, Sergeant Bonazzo has testified that he was absent from the aforementioned altercation in front of the residence for only a very short period of time, 20 to 30 seconds, and that he did not witness a beating or see any visible injuries to Defendant.

The Defendant stated during the video-tapped interview that, "they threatened to kill me." The Court has found by a preponderance of the evidence that this statement relates to the Clay County Sheriff's threat, prior to Defendant Short's arrest, to shoot and/or kill the Defendant if he did not take his hands out of his pocket. Sergeant Bonazzo asked the Defendant, prior to taking his statement, whether he had been threatened by anyone to induce him to talk, and the Defendant said no.

The interviewing officer went over the Defendant's Miranda rights with him before questioning him; he repeatedly informed him that he did not have to answer his questions and could stop at anytime; he informed him on more than one occasion that whatever he said could be used against him in Court; he told the Defendant, upon the Defendant's inquiry if giving a statement would result in more lenient treatment, that punishment was up to the Court and that he had no control of that; he allowed the Defendant to make a phone call to find someone to look after his dogs; he got the Defendant a glass of water; and he removed the Defendant's handcuffs. Nothing in the interviewing officer's behavior, statements or responses could be considered coercive. Further, there are no characteristics of the Defendant that would appear to make him more vulnerable to the interviewing officer's questioning than the average Defendant. Upon review of the entire record, the Court finds, by a preponderance of the evidence, that the Defendant's confession was in no way induced by duress or coercion, that the Defendant's will was not overcome, and accordingly, that his statement was made voluntarily.

Based upon the aforementioned findings of facts and conclusions of law, the Court finds that the search of Defendant Short's residence was reasonable and not in violation of any of his constitutional rights. Further, the Court finds that Defendant Short's statement following his arrest was voluntary and also not in violation of any of his constitutional rights. Accordingly, it is hereby

**ORDERED** that Defendant's **Motion for Leave to File Motion to Suppress Out of Time,** filed on November 8, 2007, shall be, and the same hereby is **GRANTED**. It is further

**ORDERED** that the Defendant's **Motion to Suppress Illegally Seized Evidence**, filed on November 8, 2007, shall be, and the same hereby is **DENIED**. It is further

**ORDERED** that Defendant's **Motion to Suppress Statement**, filed on November 19, 2007, shall be, and the same hereby is **DENIED**.

The Court, deeming it now appropriate to place this criminal action back upon the Court's docket for trial, hereby

**ORDERS** that a final pretrial conference in this matter shall be held on **Tuesday, March 4, 2008 at 10:00 a.m.**, and that jury selection and trial in this matter shall begin on **Wednesday, March 12, 2008 at 9:30 a.m.**

The Clerk of the Court is directed to transmit copies of this Order to Counsel for the United States, to Counsel for Defendant, and to the Probation Office.

**ENTER:** January __7th__, 2008

                                                  **/s/ Robert E. Maxwell**
                                                  United States District Judge